For appellant, we have, is it Randy Baker? Yes. Good morning, Your Honors. You heard my little mini lecture earlier about your clock. Yes, yes, I tried to pay attention to that. The court went way over time in the first one. We can't guarantee you that here. Fair enough. I'll keep my eye on the clock. In addition to answering your questions, I plan to address two of the issues we raised in the briefs. The first is the District Court's error in granting summary judgment on Dr. Diederich's claim for retaliation under the Washington law against discrimination. And the second issue I'd like to touch on is the District Court's granting the motion to dismiss on the claim of discharge in violation of public policy. Help me on something here. As I understand the case, there are a lot of things that, one way or another, have been winnowed out of it and it's now limited. I want to make sure I understand it right. The contract claim, breach of contract claim is gone. The due process claim wouldn't apply because there's no state action. There is no discrimination claim as such. All there is is a retaliation claim. The idea is that his lawsuit against a Swedish for the previous termination was a protected activity and that asserted an age claim. So retaliation for that lawsuit is barred. Do I understand the structure right? Not exactly, Your Honor. So we have four claims. The first claim is the retaliation is for Dr. Diederich's having brought a disability lawsuit against his prior residency program at Swedish and its director. So that's the one that I thought was alive. Yes, okay. And then there are three others. There's the discharge in violation of public policy that I mentioned. The public policies being that medical doctors and residents are not supposed to treat patients while they have dangerous, contagious illnesses. And they're also not supposed to be required to, to, uh, uh, they're not, uh, they're required to be allowed to demand enforcement of the regulations of the American Council of Graduate Medical Education. So that's a separate claim for telling him he can't go home when he's dismissed on a 12B6 motion. He said he was sick and he needed to go home. He was nauseous or something. And his boss said, you can't go home. You have to stay here. Well, exactly. And he complained about that repeatedly and, and was subsequently punished and allegedly in the complaint because it was dismissed on the complaint, fired. As far as the, um, part of it is, is dismissed. So what happened was, uh, in the district court, the, there was a contract claim, some part of the contract that's still alive. Yes, there is. So, so, um, uh, Judge Jones allowed to continue the claim for contract damages for the balance of Dr. Dieterich's second year in the residency program. Why didn't, yes, he did. And then it was voluntarily dismissed. With prejudice. That's right. However, what, um, Judge Jones granted summary judgment on and which were appealing is his claim for consequential damages. Those damages being the difference between his likely earnings as a scientist in his current position. I don't understand that. I thought, I thought it was purposely dismissed with prejudice just so you could get a final judgment and get to appeal. And now you're saying it isn't. Well, Your Honor, I don't think that's what I'm saying. So Judge Jones split the contract claim in half. The contract claim sought damages for the balance of Dr. Dieterich's salary for the second year of his residency. And it also claimed consequential damages because he had a due process right to have his contract for residency renewed so he could actually practice medicine as a family practitioner. So what, uh, the district court did was it said, well, you do have at least, uh, you overcome summary judgment on your claim that you're entitled to damages for the balance for your salary for the balance of this year, but you do not have a contract. Your contract does not cover renewal. The Providence was entitled to terminate you at the end of your second year. And so you lose. I'm granting summary judgment on your contention that the contract extended to renewal. But it was a damages issues that he granted summary judgment on, right? The, the, the contract itself wasn't challenged in the summary judgment motion is my understanding. So you didn't have an adverse ruling from judge Jones on that issue only on the one type of damages you were asserting. Why am I, your honor? I think he actually did rule on the content of the contract as well. Yes. And he said, and I believe the district court said there was no breach for renewal that, that Providence did not contract to renew your contract. Well, I think we may have a difference of opinion about that. So I don't, I don't want to get you off track. I think you don't, but just make a mental asterisk if you would, about that, because I don't think you finished answering judge Kleinfeld's question, but just so you know, my read of it is that since, since Providence didn't challenge the contract, that wasn't part of the summary judgment motion. I think my understanding, so please correct me when you come back to it, um, is that what you had is an adverse ruling on the damages issue. Okay. Well, I want to answer your question. So I'm going to go ahead and finish judge Kleinfeld. Judge Kleinfeld. Uh, so your understanding is that there was one contract claim and that we dismissed it. Is that correct? Not exactly. Uh, there was a breach of contract claim and the idea is number one, uh, I was entitled under our contract to get the third year and number two, I was entitled to get paid for the remainder of the second year. The first one was dismissed. The second one wasn't dismissed, but it was, uh, by the judge, but it was dismissed by the plaintiff so that the plaintiff could get a final judgment for appeal. That's what I thought. That's right. And so as a result, our intent and understanding is by dismissing that with prejudice, Dr. Diederich cannot claim damages for the second year. Excuse me. That's what I was asking. Okay. And then you had a fourth thing that you said wasn't. The fourth claim was, um, tortious interference with contract, which I'll address if you have questions on, but that's not one of the claims I intend to address right now. Okay. Let me, um, just to make your chore a little simpler as to one judge, the claim I'm most interested in is the retaliation claim and what I'd, and interested by that, I mean, the one I think your client has the best shot on. And, uh, my question is this, and it's probably a softball question. Is, uh, is there authority at the U.S. Supreme Court or the Ninth Circuit or some other circuit that says that when a person engages in protected conduct with regard to say company A, you know, here, Swedish, that if a later, a subsequent company retaliates against that person, uh, with an adverse employment action based on the protected conduct with the earlier company, that there's a claim against the new company? Well, there is, that's, that's a question that everyone passed over, isn't it? Um, the McMurty case from the Second Circuit that we cite, I'll see if I can find you the exact citation, um, did so hold, but obviously it's a Second Circuit case. You're not bound by it. Uh, and McMemory, McMenany, it's 241 F third 279. We cited, I believe at page 22 of the appellant's opening brief. In that case, the Second Circuit was trying to, um, review the reasoning of the U.S. Supreme Court. And I, I'm sorry, I, I don't recall the case it was reviewing. Uh, but it concluded that, um, the retention, the protection of retaliation in light of the Supreme Court's decision only would make sense. It would only be fully enforceable if, in fact, an, an employee who could not. Your answer is that you think the Second Circuit has ruled squarely on that? Yes. But our circuit hasn't yet. I, I couldn't find it and I looked for it. You'd like us to follow that, uh, if it's an issue here. Let's say we assume that one in, in your favor, uh, for purposes of discussion. I would like some help on the factual predicate for the claim. The claim is basically, uh, the doctor was entitled to sue the first hospital and did, uh, and it's protected activity, so retaliation for having done so is prohibited. Uh, the second hospital, if it fired him for suing the first hospital, um, would be subject to inaction. However, if the second hospital fired him and it had, uh, it was not in whole or in part because of his, uh, lawsuit against the first hospital, then he would not be entitled to recover. Now, when I look at the record here, it looks like the second hospital, um, fired him perhaps because his supervisors thought he was a bad doctor, perhaps because his supervisors just took a personal dislike to him and were bullying him and ganging up on him. Uh, there's some evidence, uh, that that might be so, like, um, when he has an emergency and there's no time to do the additional sterilization project. And certainly when they say, even though you feel like you're about to throw up, you can't go home. Um, uh, there's evidence for that, but that would not be retaliatory. It would not be actionable. It would just be a bad boss. Yeah, that's right, Your Honor. But I don't see what evidence you have that it's, that gets past the scintilla over to a genuine issue of material fact on them firing him because of his lawsuit against the first hospital. Well, let me, okay, fair enough. So the Renz case, which we cite, explains that, um, uh, causation in a retaliation case can be shown by knowledge and then termination. When, when you cite the case, it's sort of not enough for me because cases are all always about the individual facts of the particular case. And here it looks like as far as you can get is scintilla stuff, like there's enough contact between doctors at the first hospital and the second hospital. So they might have known and they might have chatted about this doctor who filed a lawsuit. Um, but there's very considerable evidence that they hated this guy, whether for good reasons or bad reasons. And I don't know what evidence you have in the record as opposed to the cases about whether they fired him for suing. Okay. Two points. One's legal, one's factual. The legal point, the Hernandez case, which we cite for the proposition that employers don't state, generally speaking, that I'm retaliating against you. Okay. So let me, let me move to our circumstantial evidence. So here's the circumstantial evidence. Dr. Houghton, who's the director of, of the private Providence residency program on one occasion. So, well, it starts with the fact that your client had an okay evaluation the first year, right? It was a, it was a positive evaluation five months into the program. Thank you, your honor. On November, 2007, he was evaluated by defendant Miller on 26 indicators. He equaled or exceeded requirements on all the indicators. A few weeks later, Dr. Dieterich is meeting with Dr. Houghton, the director of the program. And Houghton says to him, I've learned all about you. I know all about you. And then he said, I spoke with Sam Cullison, two different occasions, right? Two different occasions, very close in time, both entirely out of context. Were both of those statements made before the onset of this change of fortune where he has this cascading string of problems? Yes. So you're relying on circumstantial evidence and then also, I'm not trying to put words in your mouth, but your time is ticking. Do I have it right? You're relying on the circumstantial evidence. He had a good evaluation. There's those two statements, which I agree with Judge Kleinfeld are awfully cryptic. And then I think you're relying on the proximity and time of those statements. And then the very serious turn of events he had at work. Yes. And I would point out not just a serious turn of events, but remember, this is a summary judgment motion, right? False allegations. So suddenly five months, he's doing fine. He has these cryptic remarks, which I would suggest at least a reasonable jury could think means I found out about your lawsuit. I don't think they could, unless you put all this together. Isn't that your case? I want to make sure I have understand your strongest argument. Well, your honor, my strongest argument is on their own. These statements by themselves should survive summary judgment. But when you combine them with totally irrational, just a cascade, as you said, of unfair discipline culminating in termination, which itself was ridiculous and total violation of their rules. Yeah. A reasonable jury could think discrimination, retaliation could have played a role in that. And that's all we have to show. We don't have to show it's the major cause, just that it tipped the scales. I assume it's Dr. Cullison, Sam Cullison testified that he never told anybody about this. He did so testify and he's a biased witness. Dr. Dieterich sued him, so he doesn't get credited on summary judgment. Summary judgment, we don't make credibility determinations. So that's your, that's your position, right? That's right. We, we, we credit the, the opposing party on summary judgment. Right. And so on summary judgment, getting back to Judge Kleinfeld's point, on summary judgment, your client says he never told anybody about Swedish. Right. He was afraid of retaliation. Right. And so the, what the best he's got to prove that they knew is because Dr. Cullison said he never told anybody. The best he's got is just these bits and pieces that we just reviewed and relying upon the proximity. Yeah. And, and I should add one other thing too. Dr. Houghton denied making the second statement. He denied saying, I spoke with Sam Cullison and in, since this is a discrimination retaliation case, we can assume on summary judgment, he was lying. And when the defendant is lying, that also is evidence of discriminatory intent. Whether the jury chooses to make that inference, I don't know, but I don't have to concern myself with that. What did Dr. Houghton say later that he had an inkling that, that, that doctor, that your client had sued Swedish, an inkling. When does he say he had the inkling? He says, he says, I had an inkling right after I fired him. And so there's an indeterminate time. That's what I thought. That doesn't make sense to me. After, okay. Do you mean that, did he mean in context that after he had fired your client, he then had an inkling or that after he, or that he had an inkling earlier? It sounds, it, my understanding and the way I represented in the brief is after he fired him, but while the appellate process, so the appeals process, I think was five or six weeks. One, my understanding from the context, I'm sure counsel will present you their interpretation, is that sometime around the time he decided I want to fire Dieterich before the appellate board makes its decision, he had an inkling that Dieterich had brought the prior suit. Thank you. Why would that make it retaliation? Uh, what, what I'm thinking of is, well, actually I had a case about this, um, years ago, and this one looks analogous at doctors at one institution wanted to get rid of a doctor that they thought was a bad doctor. So they wrote him a really good recommendation and palmed him off on somebody else. And they would never admit, out of fear of their own liability, that they had lied and said he, they thought he was a good doctor. Uh, here it looks as though this Dr. Cullison at the first institution, uh, it would not be a reasonable inference to think that he lied and that Houghton knew he was lying and that actually they had talked about Dr. Dieterich being a litigious employee. It seems like a more reasonable inference that, um, Dr. Cullison had written that favorable recommendation and, uh, would never admit that he'd lied in his favorable recommendation because he would subject himself to, um, and his institution to liability for that, for palming, for the, for palming off, uh, Dr. Dieterich by a falsely positive recommendation. Well, Your Honor, that's certainly plausible, but of course this is summary judgment, so we're entitled to all reasonable inferences in our favor. And the reasonable inference In a much longer stretch, you needed, you need an inference that the doctor at the second institution. Yes, as in most retaliation cases. But he says they didn't do and they have an interest in not saying that they did. Well, Dr. Cullison doesn't like my client because my client sued him and there was a settlement and it involved significant money and Dr. Cullison had to write a letter. And insofar as we assume the truth of the matters asserted, which we get to on summary judgment, Dr. Cullison, you know, broke the law. He fired my client for having a disability, which is improper. It's unprofessional and it's illegal. So, uh, he wouldn't like my client for, for having, um, sued him for that. Counsel, could I just ask one other question? The confidentiality agreement with, um, in the Swedish settlement? Yeah. I don't think it's bilateral. I think you're right, Your Honor. Um, the it's, I believe paragraph 12 of the agreement specifically binds Dr. Dieterich to, uh, keeping the settlement confidential, but there's no reference to, um, Dr. Cullison. It's a supplemental excerpts of record. Where is it? Uh, page 260 of the supplemental excerpts of record. Yes. I'm sorry. It's paragraph 10. Dieterich agrees to keep the existence and the terms and conditions of this agreement strictly confidential. Okay. Well, we're six minutes past your, I apologize. No, it's okay. We've been asking you hard questions and, uh, I just think we should let Providence have their say. We'll give you another minute for rebuttal. Thank you. Okay. Please. The court, Boris Gaviria, uh, of the La Peru Davis right to remain representing the defendant at police in this matter. And, uh, I would like to start by just briefly, um, talking about the claims that are no longer here because Providence does not agree that the breach of contract claim, uh, is still available in this case. And I will, uh, the, the chain of events, which was admittedly an unusual one. Could you help me on something that's, that that's really the primary area of my concern here? Sure. Um, summary judgment, you do assume, uh, genuinely disputed the facts in favor of the party against whom it was rendered. Uh, somehow I cannot get out of my mind the watchword of that wonderful television series house, uh, the doctor series where the watchword is everybody lies. Um, the, there is a real possibility that, uh, the parties on the employer side all lied and that a case would have to be made by inference. Um, and your, uh, your adversary is correct that circumstantial evidence by inference can be enough to establish a genuine issue of material fact. So why can it not be inferred that by a jury? Why isn't there enough for a jury to draw the inference that sometime after having Dr. Diedrich palmed off on them, uh, the second institution found out that he'd sued the first one and figured we better get rid of this guy before we give him more time? Well, your honor, I, let me start with the initial chain of events first. Oh, I should also tell you what most concerns me is when I read about the complaints by him, by a supervisor and the thing about not letting him go home when he's nauseous and he may throw up, um, I don't know, patience. Um, uh, it looked phony. Well, your honor, they, uh, the fact is that the, the court needs to address whether there are reasonable inference of circumstantial evidence. Providence does not believe that there are reasonable inferences for numerous reasons. We'll start with the positive evaluation, the positive evaluation, which is found in the record at one 53. This is not a complete evaluation. The time period, the evaluation date here states that it's November 21st through December 7th. This is one of many rotations that the residents were actually on and there were both positive and negatives. Unfortunately, they're not clearly in the record. However, what is in the record is that this evaluation that's relied upon is highly limited on its own phase. I know I'm interrupting, forgive me, but I've, I've read ER one, five, three, or were there other interim evaluation? Uh, there were, there were every time that they go on a different rotation and they're, um, approximately, and I may be wrong, my lay knowledge of how long those are, but they're approximately three to six week rotations. So you're going to get a very similar set of forms and there were numerous ones that had both positive and negative information. So I think I have looked at the correct excerpts. Yes. Your, and your position is that they weren't entirely positive. Correct. They hired him back the second year. Correct. No dispute about that. Okay. Yep. So that's the, that's the initial inference there. The second inference I would like to talk about, uh, is just the, the fact that there, uh, that all of the Providence witnesses, not just Dr. Cullison deny making these statements. Therefore, this isn't a case where you have competing statements about, there's no situation here where somebody actually overheard a discussion about the Swedish lawsuit among the Providence. Um, no, they all said they didn't know about it. Correct. Yes. In his declaration, Dr. Dietrich said Providence did not know about my suit. Respondents brief, 25 supplemental evidence, 47 at his deposition. He admitted, I don't know if Dr. Cullison shared information about the prior lawsuit. Respondents brief, 25 supplemental evidence, 55 Dr. Dietrich admitted he never discussed it with anyone. That's that respondent brief, 27 supplemental evidence, 41. In addition, the facts that regardless of whether everyone lied, these other facts are not disputed and actually destroy the timeline of any possible retaliation. Uh, Dr. Dietrich's assumption is that Providence somehow learned in December, 2007. However, the residencies are on one year contracts. The renewal period came and Dr. Dietrich was, had his contract affirmatively reviewed, renewed on May 19th, 2008. That's at the record at SER 174. Dr. Houghton was asked, why did you renew his contract? I then renewed Dr. Dietrich's contract for a second year because he had completed his probation requirements and he had improved his performance. So going back to the TV show house, although everyone lies, there's no explanation for why, if there is an animus here, you wouldn't just simply not renew that first year contract. Okay. For those of us who don't watch house, is your argument, what is your argument that you were explaining why the contract was renewed? It doesn't make sense. If, if there's a broad conspiracy to retaliate against Dr. Dietrich, why is his contract renewed prior, a few months prior? You're saying he would have known about the lawsuit before he renewed for the second year. Correct. So if he wanted to retaliate for renewing for the second year, he wouldn't renewed for the second year. Exactly. When were the statements made? Um, uh, I talked to Sam Cullison chronologically. I have a timeline here somewhere I made, but yes, he, I, we have it briefed and this is, uh, this entire discussion is, uh, set forth in respondents brief pages 34 to 35. We believe it's around page 56, 57, um, was one of those citations where Dr. Dietrich believes it was December, 2007 that Providence learned about the prior Swedish lawsuit. No, but my question is, when did that conversation happen? According to plaintiff, if we view this in except his, his, uh, version of events, when does he say that Dr. Houghton said, I talked to Sam Cullison around that time, December, 2007. Yeah. Yep. So those, uh, that's part of the problem. And, uh, the other going back to the question, why isn't there a reasonable inference here? There's also extensive and well-documented evidence of ongoing performance problems here that are not completely disputed at all. There's a remediation plan memo on January 11th, 2008 found at the record SCR one 41 Dr. Dietrich delayed patient discharge summaries. So the most current information was not available to other providers, February 8th, lack of attention to detail, untimely exams, delay in evaluations, failure to promptly examine patients waiting for lab examinations, SCR one 51. I didn't understand all this stuff. Does that mean, I know a doctor is supposed to do a bunch of notes after he sees a patient. Does this mean he wasn't getting his notes done? That's my understanding. Yes. That's what's in the record that, uh, for example, SCR one 78th, June 30th, uh, his advisor found that clinical results in his inbox were as much as two months old, which he hadn't responded to. Uh, there was a, a, a specific description, I believe about not completing paperwork on time in both the January and February notes. And then in short here, what we have is overwhelming evidence that isn't disputed, that there are performance problems, that the timing, in fact, of the events that would have been evidence of retaliation don't fit in with the sequencing of events. It still doesn't make sense why if there's a grand conspiracy, uh, most importantly, just as a common sense matter, why would they have waited and renewed his contract for an additional year? Does that answer the question? Were you going to address the contract claim? Yes. I, they, the reason that Providence believes that this, uh, claim in its entirety is not before the court, the, the issue was only a damage limitation. There was not a split situation where there are two different contract claims. What happened here was that Dr. Diedrich, following the partial summary judgment motion on the damages, he, his prior lawyer asked permission to withdraw and he filed a motion saying that the court, requesting that the court dismiss his federal claims for lack of subject matter jurisdiction. That discussion is in the supplemental evidentiary record 296 to 299. The district court denied his motion, ruled that his case would proceed on his one remaining claim, which is breach of contract. That order is SER 301. That actually was not under appeal in this case. So we believe, Providence believes that there is no breach of contract claim here. In addition, Dr. Diedrich could have, but did not move for final judgment on less than all of his claims pursuant to 55, 54B. Thank you. Counsel, I was just looking and I'm, I'm, uh, could you help me out with the, with the citation to the, I think it's the amended complaint, whatever the operative complaint is. Where's that in the record? I'm just flipping and not finding it. I'm sorry, the amended complaint? I thought there was only one complaint. Do you mean the amended? Whatever the operative complaint is, is what I'm asking for. Could you just have the citation for me? Sure. Yep. Give me a moment to check my index. Apologize. It is, um, under the notice of removal. Uh, it's an exhibit. It's evidentiary record 526 to 560. Thank you, Mr. Gaviria. I wonder if you could please give me a little help on the legal framework. What I'm wondering is, do you agree with appellant? You disagree on the theory that company number two can be liable under the Washington Law Against Discrimination or Title VII for retaliating against an employee for that employee's protected conduct with company number one. And if there's apparently a Second Circuit case that says that, then I guess I'd like to know, does Providence agree that the Ninth Circuit should follow that in a way that there was no appeal? There were two retaliation claims. One was under state law, the WLAD. There was also an ADA retaliation clause. That one was clause violation alleged. That particular component was not appealed. Therefore, the only issue before the court is actually the state law WLAD retaliation claim. I do not believe that that issue has been squarely addressed under Washington law, whether you can potentially have a retaliation claim against the second employer for something that happened under the first one. What Washington law is clear about is for that protected activity to qualify as a protected activity, it specifically has to be addressing conduct that's prohibited under the Washington Law Against Discrimination. It wouldn't be sufficient, for example, to just know that there was a prior lawsuit. It would have to be something that interrelates with the Washington Law Against Discrimination. So to the extent that it would be another in a series of chain of inferences, we believe that that would be unreasonable. And it would have to, in a hypothetical situation, the knowledge of the prior lawsuit would not just have to be that there was a lawsuit and it was an employment lawsuit, but that there were some protected categories within the Washington Law Against Discrimination at issue. I didn't understand the answer. I'm thinking, if I understand the question and the issue, the employee is employed by company one, sues company one for some sort of discrimination against some sort of protected class, leaves company one, regardless of the reason, goes to work for company two, and at some point during employment with company two says to a supervisor, you know I sued company number one for discrimination. Company two then fires him. And I can't tell whether you're saying yes or no that company two is liable for firing him on account of that knowledge. I would say only company two is only liable under the Washington Law Against Discrimination if there's enough information and there's an actual direct tie to protected activity under the Washington Law Against Discrimination. He says to the company two supervisor, you know I sued company number one for discrimination. And company two supervisor says, okay, you're fired. I was trying to distinguish the legal question from the factual question and whether there'd be enough evidence and so forth. And I can't tell what your answer is. I think in that hypothetical, which I'll respond to is the exact opposite of the testimony by the plaintiff here, in that particular case, I would believe that that would be activity in opposition of the Washington Law Against Discrimination. Because they know not just there was a prior suit, but that it's a prior suit for discrimination. Exactly, yes. And so your position is this doesn't rise to that level in this fact pattern that we have before us today because at most they knew that there was a prior suit. No, they know nothing. I don't think... You didn't outline most favorable. If you put the circumstances... Counsel, it's helpful if you answer the question. Sorry, Your Honor. That's okay. But I think you know what Judge Kleinfeld's getting at. The answer to the question, right, is that it's not enough to know about a prior suit. They needed to know that there would be a prior suit about discrimination in your hypothetical in order for company number two to be liable. Correct. In this case, your position is at best they knew about prior suit. We don't believe that's a reasonable inference. However, that's the maximum inference that would be available given what is here. Just to play devil's advocate with you on that. If the supervisor at Providence knew about a prior suit at Swedish from a conversation with someone involved at Swedish, wouldn't it be a fair and reasonable inference that the person involved at Swedish would have told them what the suit was about? Would have said, well, we got sued for disability discrimination. Not just we got sued and my lips are sealed. I'm sorry. I don't actually understand the question. Okay. If you assume, I know it's contrary to your argument, but if you assume that it's a reasonable inference that a doctor at Swedish told a supervising doctor at Providence that Dietrich had sued them, would it also be a reasonable inference that such a person would have said what the suit was about? No, I don't believe that that's a reasonable inference because for several reasons, there was an agreement, even though it wasn't a confidentiality, there was an agreement in the Swedish that the doctor would just maintain information, I think, consistent with a letter recommendation and there was a recommendation letter that was attached to that particular settlement agreement. I think it would be another unreasonable inference then to understand what the subject matter is of a lawsuit, not just saying that there had been a prior legal action between the parties. Okay. Thank you. Thank you. I understand I'm on borrowed time. So I would just point out my outstanding colleague certainly would not have omitted unfavorable evaluations of Dr. Dietrich prior to November of 2007 had they existed. So we have to look at the record. It's not in the record. He was favorable until November of 2007. The after the favorable evaluation, as far as Dr. Houghton renewing. I can't see where this guy was ever very favorable. I mean, he barely made it through his first year. He was put on probation. It looks like he was iffy from the beginning. Well, Your Honor, I don't have the citation right here, but I don't think it's disputed that Dr. Miller in November of 2007 wrote a formal review based on 26 indicators. She said Dr. Dietrich met or exceeded all of the threshold. And she said it was a pleasure to work with. And then three weeks later, he's on academic remediation for lack of professionalism, which granted professionalism is important, but it's also a subjective term without a clear empirical reference. You know, counsel just cited numerous allegations against Dr. Dietrich. But if I since I have almost no time, I'll just point out he was fired because he failed to attend to an emergency pediatric admission. He failed to notify the attending of an obstetrical laceration and he repaired a laceration without sterile gloves. Dr. Dietrich subsequently brought three medical doctors himself and a nurse to testify at the appellate hearing. He rebutted every single one of those allegations on summary judgment. That means they're false. And in fact, the appellate board, when they affirm the termination, they didn't even talk about the things he was fired for. They cited lack of professionalism, defensiveness. Again, they changed the basis on which he was terminated and he didn't even get to confront those contrary to the due process rules. These were allegations made in ex parte communications without notice to Dr. Dietrich. He learned of them afterwards. Unless there's further questions, I'm not going to push my time limit more. Okay. Thank you very much. And I think there are no further questions. Thank you. I'll say Dietrich versus Providence shall be submitted. And we thank counsel. Excellent arguments on both sides.
judges: Kleinfeld, Gould, Christen